340 So.2d 904 (1976)
STATE of Florida ex rel. Miami Herald Publishing Company, Etc., et al., Relators,
v.
Russell H. McIntosh, Circuit Court Judge, Respondent.
No. 48264.
Supreme Court of Florida.
July 30, 1976.
As Modified on Denial of Rehearing January 10, 1977.
*906 Parker D. Thomson, Susan W. Diner and Dan Paul of Paul & Thomson, Miami, for relators.
Joseph P. Metzger, Michael B. Davis and Norman E. Taplin of Walton, Lantaff, Schroeder, Carson & Wahl, West Palm Beach, for respondent.
Harold B. Wahl of Wahl & Gable, Jacksonville, for Fla. Pub. Co., amicus curiae.
William C. Ballard of Baynard, Lang & Ballard, St. Petersburg, for Times Pub. Co., amicus curiae.
Talbot D'Alemberte and Patricia A. Seitz of Steel, Hector & Davis, Miami, for Post-Newsweek Stations, Fla., Inc., amicus curiae.
W.S. Rodgers, Jr., and Ted R. Manry, III, of MacFarlane, Ferguson, Allison & Kelly, Tampa, for The Tribune Co., amicus curiae.
William G. Mateer of Mateer, Harbert, Bechtel & Phalin, Orlando, John W. Fleming and Rex Conrad of Fleming, O'Brian & Fleming, Fort Lauderdale, and Don H. Reuben, Lawrence Gunnels, Samuel Fifer and James A. Klenk of Kirkland & Ellis, Chicago, Ill., for Gore Newspapers Co. and Sentinel Star Co., amicus curiae.
Dan Paul of Paul & Thomson, Miami, for The New York Times Co., amicus curiae.
Daniel Neal Heller of Heller & Kaplan, Miami, for The Miami Daily News, Inc., amicus curiae.
C. Gary Williams of Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee, for Fla. Society of Newspaper Editors, amicus curiae.
BOYD, Justice.
This cause is before us on petition for certiorari[1] to review the decision of the District Court of Appeal, Fourth District, reported at 320 So.2d 861 (Fla.App.4th DCA 1975), which purportedly conflicts with State ex rel. Miami Herald Publishing Co. v. Rose.[2]
The facts of the case as alleged in the pleadings, and as argued both in the briefs and orally are as follows.
Three mortgage brokers and three corporate brokerage firms are charged with "... selling unregistered securities, selling securities while not registered as a securities salesman, securities fraud, grand larceny and conspiracy to sell unregistered securities and to commit grand larceny... ." These charges are the first to emerge from the Comptroller's statewide investigation into what he terms a mammoth securities and mortgage fraud within the State. Since this investigation has been the subject of widespread coverage by state and national press, the six criminal defendants joined in a Motion to Control Prejudicial Publicity, which motion was served only *907 on counsel for the State and for the defendants and was heard along with other pre-trial motions. Upon consideration of the motion, argument of counsel, a file of press clippings and the authorities presented by the parties to the criminal action, Respondent entered his first order in which he ordered:
"1. The defendant's Motion to Control Prejudicial Publicity, in order to afford a fair trial of this cause, is hereby granted and the Court orders as follows:
"A. Members of the news media shall not report any testimony presented and/or evidence exhibited in the absence of the jury unless same shall have been admitted in evidence by the Court, or is a public record, or is presented in open court in the presence of the jury;
"B. Defense Counsel, all members and employees of the Palm Beach County State Attorney's Office, all members and employees of the Attorney General's office, members and employees of the Division of Securities, and members and employees of the Office of the Comptroller, and all officials of the State of Florida, including the Comptroller and the Attorney General of the State of Florida, law enforcement officers, subpoenaed witnesses, bailiffs, clerks and other officials in attendance to this Court, shall not give or authorize any extrajudicial statement or interview relating to the trial of this cause or the parties or issues in the trial for dissemination by any means of public communication during the course of this trial, except they may quote from or refer without comment to public records, or testimony or evidence that has been admitted in evidence during the course of this trial.
"2. The intendment of this Order is to prevent publicity of a nature that would tend to adversely affect the rights of the defendants to a fair trial."
On his morning arrival at the courtroom Relator Schwartz, a reporter for Relator newspaper, was instructed to pick up a copy of this order, which he did. That afternoon, Relators sought revocation of Respondent's first order; a hearing was scheduled for the following morning. At that hearing, Relators filed a Motion to Vacate Respondent's first order, supporting their Motion with a memorandum of law. No additional factual support for the first order was submitted. At the conclusion of the hearing, Respondent entered his second order in which he not only denied Relators' Motion on the ground that they had no standing to challenge the first order but he also made the following gratuitous "findings of fact":
"That there has been a considerable amount of publicity by news media throughout the State, some of which quotes high government officials on the subject matter of this prosecution;
"That it is reasonable to expect that this publicity will continue during the course of this trial; and
"That the continuance of this publicity if it is permitted to include proffered testimony and/or documents or other physical evidence which are inadmissible against the defendants or opinions of public officials, attorneys, court personnel, and other restrained by the contested order constitutes a `clear and present danger' that the defendants in this prosecution will not receive a fair trial unless the order entered herein be enforced."
On October 15, 1975, immediately after the denial of their Motion, Relators sought expedited review in the District Court of Appeal, Fourth District, by filing a Suggestion for Writ of Prohibition, which Suggestion was denied Per Curiam, with a dissenting opinion on October 17, 1975. The selection of the jury which began October 14, 1975, concluded on Friday, October 17, 1975. The taking of testimony commenced on Monday, October 20, 1975. Thereafter, on October 28th, some eleven days after the decision of the District Court, Petitioners filed for relief in this Court, seeking, among other things, a Stay Order suspending operation of the trial judge's orders. An emergency hearing was set and oral argument heard on Monday, November 3, 1975. After *908 careful review of the record, we made the following determinations:[3]
"1. That the Petition for Prohibition, Mandamus and Stay Order is denied.
"2. Pursuant to Section 2(a), Article V, Constitution of Florida, the Court has classified the Petition as a Petition for Conflict Certiorari ... Relief requested for any other constitutional relief is denied.
"3. [The parties] shall file their briefs on jurisdiction and merits ... with oral argument . .. to be heard on jurisdiction and merits on November 17th... ."
Briefs having been filed by all parties and a multiplicity of amicus curiae and oral argument having been heard, we find that in considering this petition for certiorari we are confronting the monumental task of balancing equally important constitutional rights: the right of a defendant to a fair trial and the right of the public to know facts by way of a free press.
Initially, let us consider the arguments for a "free press" as presented by Petitioners. Any form of prior restraint of expression comes to a reviewing court bearing a heavy presumption against its constitutional validity; therefore, the party who seeks to have such a restraint upheld carries a heavy burden of showing justification for the imposition of such a restraint.[4] While a court is legitimately concerned with preventing prejudicial publicity from poisoning the impartial atmosphere essential to a fair trial, the court's action in restricting the media must relate to the danger sought to be avoided and it must not be unconstitutionally overbroad.[5] "For instance, in C.B.S., Inc. v. Young,[6] the court held that to justify imposition of a prior restraint, the activity restrained must pose a clear and present danger or a serious or imminent threat to a protected competing interest and that such a restraint cannot be upheld if reasonable alternatives are available." In U.S. v. Dickinson,[7] the court observed that before First Amendment freedoms can be abridged, substantive evil must be extremely serious and the degree of imminence extremely high. The standard to be met is that the expression by the press must constitute "an immediate, not merely likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil."[8]
It has been recognized in Florida and elsewhere that the news media, even though not a party to litigation below, has standing to question the validity of an order because its ability to gather news is directly impaired or curtailed.[9] This is so, because the public and press have a right to know what goes on in a courtroom whether the proceeding be criminal or civil. A member of the press or newspaper corporation may be properly considered as a representative of the public insofar as enforcement of public right of access to the court is concerned; and the public and press have a fundamental right of access to all judicial proceedings. In determining restrictions to be placed upon access to judicial proceedings, the court must balance the rights and interest of the parties to litigation with those of the public and press.[10] Reporters are plainly free to report whatever occurs in open court through their respective media.[11] A *909 trial is a public event, and there is no special perquisite of the judiciary which enables it to suppress, edit or censor events which transpire in proceedings before it, and those who see and hear what transpired may report it with impunity,[12] subject to constitutional restraints mentioned herein.
Nevertheless, a trial court has the inherent power to control the conduct of the proceedings before it,[13] and it is the trial court's responsibility to protect a defendant in a criminal prosecution from inherently prejudicial influences which threaten fairness of his trial and the abrogation of his constitutional rights.[14] Florida has held already that through admonition to jurors and through sequestration of the jury, a trial judge has ample power to insure a fair trial for a criminal defendant without suppressing First Amendment rights of the news media as regards reporting proceedings.[15]
We now turn our attention to Respondent's arguments upholding his actions as necessary to secure a fair trial for the criminal defendants. Respondent asserts that the Orders before this Court must be considered not only in light of the First Amendment as it relates to freedom of the press, but also in connection with the due process requirements of both the Fifth and Fourteenth Amendments and the provisions of the Sixth Amendment securing a defendant a fair trial.
In Estes v. Texas[16] the Court stated that "fair trial [is] the most fundamental of all freedoms." In that case the Court went on to say:
"While maximum freedom must be allowed the press in carrying on this important function in a democratic society its exercise must necessarily be subject to the maintenance of absolute fairness in the judicial process... . We have always held that the atmosphere essential to the preservation of a fair trial  the most fundamental of all freedoms  must be maintained at all costs." (emphasis supplied)[17]
The leading case in this area is Sheppard v. Maxwell,[18] in which it was stated:
"Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the persuasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to insure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances."[19]
In United States v. Tijerina[20] the following is found:
"... The defense argument [that the statements in Sheppard are dicta] necessarily places freedom of speech in a preferred position above fair trial. Some decisions of the Supreme Court place First Amendment rights in a preferred position... . This preferred position has never been approved in a case where balance must be had between free speech and fair trial. Indeed, the Court has awarded the preference to fair trial ... Estes v. Texas ... The order against extrajudicial statements was designed to maintain atmosphere essential to the preservation of a fair trial, *910 `the most fundamental of all freedoms.'"[21]
In Allegrezza v. Superior Court of Alamedia County[22] trial courts were directed not to accord the press greater rights than are assigned to defendants in criminal proceedings.
Clearly, the essence of this case is reconciliation and application of Federal and State constitutional rights to achieve both a fair trial and freedom of the press. Those who adopted the Bill of Rights had personally experienced the actions of King George, III, in denying these and other rights. It is reasonable to assume they recognized the interdependence of each provision of the Constitution of the United States upon all other provisions. Without fair trial freedom of the press could not exist, and without freedom of the press fair trials could not be assured. The federal Constitution constitutes a uniform and cohesive umbrella to protect the people against oppression, injustice and tyranny. Since no two criminal trials are exactly alike, each trial judge must apply federal and state interpretations of the Bill of Rights and must balance the rights of free press and fair trial to assure that justice and fairness prevail in each trial. To attain true justice the written law must be seasoned with a proper amount of common sense.
The inconvenience suffered by jurors who are sequestered to prevent exposure to excluded evidence which may be published in the press is a small price to pay for the public's right to timely knowledge of trial proceedings guaranteed by freedom of the press. It is argued that a temporary withholding of news from the public may aid in assuring a fair trial and that if the State and defendant agree to muzzling the press no one else has a right to object. We firmly reject any suppression of news in a criminal trial except in those rare instances such as national security and where a news report would obviously deny a fair trial as stated above in Federal cases.
Freedom of the press is not, and has never been a private property right granted to those who own the news media. It is a cherished and almost sacred right of each citizen to be informed about current events on a timely basis so each can exercise his discretion in determining the destiny and security of himself, other people, and the Nation. News delayed is news denied. To be useful to the public, news events must be reported when they occur. Whatever happens in any courtroom directly or indirectly affects all the public. To prevent star-chamber injustice the public should generally have unrestricted access to all proceedings.
Although freedom of the press belongs to all the people those who gather and distribute news have special concerns which entitle them to notice and a hearing before any trial court enjoins or limits publication of court proceedings. The circumstances may require a summary hearing but reasonable notice under prevailing conditions and a hearing must be had in each instance. The court should serve notice to news reporters present, but no order entered in good faith is invalid for lack of notice to one or more who may be unavailable to receive notice. Announcement from the bench or publication in writing in the courtroom should be adequate.
Limitations placed upon lawyers, litigants and officials directly affected by court proceedings may be made at the court's discretion for good cause to assure fair trials. Muzzling lawyers who may wish to make public statements to gain public sentiment for their clients has long been recognized as within the court's inherent power to control professional conduct. The constant spotlight of public attention focused upon public officials during litigation makes it imperative that they be more subject to judicial restrictions against inflammatory and prejudicial statements than other persons. With the exception of lawyers, *911 litigants, witnesses, jurors and court personnel, the court should limit restrictions against comments to those areas in which clear and present danger of miscarriage of justice might arise from statements affecting or relating to the trial.
In Nebraska Press Ass'n et al. v. Stuart, ___ U.S. ___, 96 S.Ct. 2791, 48 L.Ed.2d 683, 44 U.S.L.W. 5149 (1976), the United States Supreme Court reviewed an order entered by a trial court in a sensational murder trial. The order, as modified by the Nebraska Supreme Court restrained the press from publishing accounts of confessions or admissions of the accused and other facts "strongly implicative" of the accused. Although the order expired by its own terms upon impanelment of the jury which indeed had been impaneled at the time of its decision the Court held the issue of whether the order unconstitutionally impinged on freedom of the press in violation of the First Amendment was not moot since the controversy between the parties is capable of repetition, yet evading review. The Court then held that the heavy burden imposed as a condition to securing a prior restraint was not met in this case for several reasons, among them, that there was no showing that alternative measures might have protected the accused's rights, that there existed doubt that the accused would have been protected by the prior restraint and that to the extent the order prohibited publication adduced at an open preliminary hearing it violated the principle, enunciated in Sheppard, that the press may report events that transpire in the courtroom. Although the trial in this case is over the issue of violation of the guarantee of freedom of the press is not moot, just as it was not moot in Stuart, and although the prior restraint in Stuart is not precisely the same as it is here, the accommodation of the two constitutional guarantees at which we arrive is strengthened by the holding in Stuart.
To conclude, we issued a writ of certiorari and exercised jurisdiction herein because the decision of the District Court of Appeal, Fourth District, reported 320 So.2d 861 (Fla.App.4th DCA 1975), conflicts with State ex rel. Miami Herald Publishing Co. v. Rose.[23] We have examined the facts and the law; we conclude that Rose, supra, correctly states the law. Accordingly, the decision of the District Court in this cause is quashed.
It is so ordered.
OVERTON, C.J., and ADKINS and HATCHETT, JJ., concur.
ROBERTS, J., concurs in conclusion.
ENGLAND, J., concurs with an opinion.
SUNDBERG, J., concurs with an opinion.
ENGLAND, Justice (concurring).
I concur in the result achieved by the majority's opinion, and in the procedural suggestions formulated by Mr. Justice Sundberg.
This case is really quite easy, it seems to me, since it presents for our review a form of court order least capable of withstanding constitutional scrutiny  one which imposes a prior restraint on reporting a public trial without notice to the media or any opportunity to be heard, and without any factual foundation demonstrating a need for the restraint. See Nebraska Press Ass'n v. Stuart, ___ U.S. ___, ___, 96 S.Ct. 2791, 2809, 48 L.Ed.2d 683, 44 L.W. 5149, 5159 (Brennan, J., concurring).
SUNDBERG, Justice (concurring).
While I concur in the thoughtful opinion by Mr. Justice Boyd, for guidance of the bench, bar and media, I would suggest that it is appropriate to be more precise with respect to procedures to be employed in accommodating the First and Sixth Amendment guarantees discussed by the majority.
Although counsel for relators makes a very persuasive historical argument against any prior restraints upon the press in reporting judicial proceedings, the decisions of the United States Supreme Court and of *912 this Court to date have not accepted his thesis. In fact, decisions of the federal circuit courts of appeal have assumed that there is some limitation upon the right of the press to publish some portions of judicial proceedings. See, for example, United States v. Tijerina, 412 F.2d 661 (10th Cir.1969). Consequently, until such time as the United States Supreme Court holds that the rights under the First and Sixth Amendments are not correlative we must establish procedural parameters to accommodate the force and operation of the respective rights guaranteed by those Amendments when they come into conflict. I subscribed to the proposition that an actual confrontation between these two essential concepts  freedom of the press and the right of a criminal defendant to a fair trial  need occur very infrequently because there are numerous means within the power of the court, such as explicit instructions to the jurors and sequestering, to insure a fair trial short of imposing a restraint on the press. Recourse to these measures, in my judgment, must be totally exhausted and found wanting before consideration be given to an order directly restraining the press in publishing events occurring in open court.
So as to facilitate review by the appropriate appellate tribunal, the trial court should explicitly set forth the reasons why the customary means available to the court to protect against the influence of prejudicial trial publicity are insufficient to provide the defendant a fair trial. In its deliberations the trial court must conclude not only that the alternative measures available are not sufficient, but also that there is a "clear and present danger" or "serious and imminent threat" that publication will preclude the fair administration of justice in the cause. See Schenck v. United States, 249 U.S. 74, 39 S.Ct. 247, 63 L.Ed. 470 (1919); United States v. Dickinson, 465 F.2d 496 (5th Cir.1972); and Chicago Council of Lawyers v. Baur, 522 F.2d 242 (7th Cir.1975).
As suggested by the report of the American Bar Association's Legal Advisory Committee on Fair Trial and Free Press, 62 A.B.A.J. pp. 63-64, persons representing the news media are best equipped to provide the input concerning the First Amendment ramifications of any action which effectively restricts the flow of information to the public. Accordingly, fair notice and an opportunity to be heard should be afforded to the news media whenever an order restraining publication is contemplated by the court. As further suggested by the report of the A.B.A. committee, whenever possible the hearing should be held sufficiently in advance of the trial to permit review of the court's order by interested parties before the matter becomes moot. A corollary of this procedure should be the willingness of representatives of the media to participate in the review on appeal of any such order when restraint is denied at the urging of the media.
It is clear to me that the action of the trial court in each of these consolidated proceedings failed procedurally to measure up to the mandate of the First Amendment when brought into accord with that of the Sixth Amendment. However, this is not stated critically because as indicated by Mr. Jack A. Landau in his article, "The Challenge of the Communications Media"[1] the progeny of Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), has brought an abundance of confusion to this area of the law. It ill behooves us to criticize the trial judge who heretofore has been placed in the delicate and emotionally charged situation of balancing two of our most precious constitutional guarantees with little real direction from the myriad of cases on the subject.
NOTES
[1] Art. V, § 3(b)(3), Fla. Const.
[2] 271 So.2d 483 (Fla.App.2d DCA 1972).
[3] 322 So.2d 544 (Fla. 1975).
[4] New York Times Company v. U.S. and U.S. v. The Washington Post Company, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822; Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).
[5] U.S. v. C.B.S. Inc., 497 F.2d 102 (5th Cir.1974).
[6] 522 F.2d 234 (6th Cir.1975).
[7] 465 F.2d 496 (5th Cir.1972).
[8] See Craig v. Harney, 331 U.S. 367, 375, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947); see, also, U.S. v. C.B.S. Inc., supra, Note 5.
[9] See C.B.S. Inc. v. Young, supra, and State ex rel. Gore Newspaper Company v. Tyson, 313 So.2d 777 (Fla.App.4th DCA 1975).
[10] State ex rel. Gore Newspaper Company v. Tyson, supra, Note 10.
[11] Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), reh den. 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118; Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946).
[12] United States v. Dickinson, supra, Note 7.
[13] State ex rel. Gore Newspaper Company v. Tyson, supra, Note 9.
[14] United States v. Dickinson, supra, Note 7.
[15] State ex rel. Miami Herald Publishing Co. v. Rose, supra, Note 2.
[16] Supra, Note 11.
[17] Id.
[18] 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).
[19] Id. at 363, 86 S.Ct. at 1522.
[20] 412 F.2d 661 (10th Cir.1969).
[21] Id. at 667.
[22] 47 Cal. App.3d 948, 121 Cal. Rptr. 245 (1975).
[23] Supra, Note 2.
[1] 62 A.B.A.J. 55 (1976).